UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WILLIAM DAVIDSON HAMBY, Jr. #135146, | ) ) ) |
| Petitioner, | ) ) |
| v. | ) NO. 3:17-cv-00793 ) JUDGE TRAUGER ) |
| WARDEN RANDY LEE, | ) ) |
| Respondent. | ) |

## MEMORANDUM

The petitioner is a state inmate serving a 14-year sentence for aggravated kidnapping in the Morgan County Correctional Complex in Wartburg, Tennessee. He has filed a *pro se* petition under 28 U.S.C. § 2254 for the writ of habeas corpus (ECF No. 1), and the respondent has filed an answer and relevant portions of the state court record. (ECF Nos. 24, 25, 30.) The petition will be denied, for the reasons set forth below.

### I. BACKGROUND AND PROCEDURAL HISTORY

The petitioner was convicted of aggravated kidnapping on October 14, 2013, following a bench trial. (ECF No. 24-1, at 50.) The trial court held a separate sentencing hearing and sentenced the petitioner to 14 years in prison. (ECF No. 24-1, at 56.) The Tennessee Court of Criminal Appeals [TCCA] affirmed the conviction and sentence on April 27, 2015, and the Tennessee Supreme Court denied review on August 13, 2015. (ECF Nos. 24-9, 24-10.)

The petitioner filed a petition for post-conviction relief in December 2015. (ECF No. 24-11, at 1–20.) The post-conviction trial court appointed counsel, who filed an amended petition (ECF No. 24-11, at 23–30), but on February 9, 2017, the petitioner filed a pro se motion asking to dismiss his counsel and dismiss his post-conviction action. (ECF No. 24-11, at 31.)

According to a minute entry on the state court's docket, attached to this opinion as Appendix 1, the post-conviction action was dismissed on March 1, 2017.[1]

The petitioner filed his original petition in this court less than two months later, by submitting it to prison officials for mailing on April 28, 2017. (ECF No. 1.) He followed that petition with a second "petition," multiple notices, motions and other filings, many of which appeared to add to or argue the merits of his claims. (ECF Nos. 2, 3, 4, 9, 10.) Accordingly, when the court granted the petitioner's application to proceed *in forma pauperis*, it also instructed him to file "an amended petition clearly setting forth every claim he wishes to pursue in this case," and advised him that such amended petition would be "the only petition answered by the respondent or reviewed by the court, so the petitioner **MUST** make sure that it contains all of his claims." (ECF No. 13, at 1–2.) The petitioner filed two more "notices" before receiving the court's order. (ECF Nos. 14, 15.) He filed his amended petition on June 27, 2017. (ECF No. 16.) The responded has filed an answer asserting that the petition should be dismissed, along with portions of the state court record. (ECF Nos. 24, 25, 30.) The petitioner has since filed four motions, asking to "present argument," for "rebuttal . . . retrial or release," for an evidentiary hearing, and for "reversal and remand," to which the respondent has not responded. (ECF Nos. 27, 31, 32, 33.)

II. **STATEMENT OF FACTS**

The TCCA summarized the evidence at the petitioner's trial, and his unusual behavior prior to the trial, as follows:

> On July 8, 2012, the defendant struck his ex-girlfriend in a parking lot and forced her to come upstairs and into his apartment against her will. He was subsequently arrested and remained in jail, where he committed numerous disciplinary infractions, including flooding his cell and throwing feces.

---

[1] The lack of a formal written order dismissing the case was noted by counsel for the respondent, who was informed by the state court clerk that "the system says the petition was dismissed in March, 2017." (ECF No. 25, at 3 n.2.) Federal courts may take judicial notice of the public records of state courts. *See Lynch v. Leis*, 382 F.3d 642, 648 n.5 (6th Cir. 2004)

On the morning of the October 14, 2013 trial, the defendant refused to come to the courtroom or participate in the trial. In the course of arguments about the feasibility of ordering the defendant's appearance, the prosecution suggested the defendant was obstructing the judicial process, citing a phone conversation before an earlier court date where the defendant had told a relative, "I know how to get this thing continued for a month or so." The prosecution also stated for the record that the defendant had been evaluated by a mental health professional and found "competent and sane." Defense counsel agreed that the defendant had been evaluated but requested a further mental examination, asserting that "[i]n light of this new episode by [the defendant], he needs to be re-evaluated." During the discussion regarding the forced appearance of the defendant, defense counsel referenced the defendant's history of mental illness but stated that the defendant had consulted with him the previous day about trial strategy and had decided to waive his right to a jury trial by asking the judge to try his case. The trial court noted that the defendant could have been referring to new legal representation in the comment regarding a continuance. The court questioned whether it could "override medical staff, with regard to ordering one to appear in a particular place." Before taking a recess, the trial court found that the defendant had been "quite lucid and … understood everything" at a court appearance approximately two weeks prior to the trial.

The record does not reflect any concrete details regarding the events of the morning nor does it reveal the manner in which the defendant's initial refusal to participate was resolved. The transcript merely resumes with the appearance of the defendant, who waived his right to a jury trial, and with the presentation of evidence.

The victim, Melissa McComb, testified that she had a history of crack addiction after losing a child in 1993. The defendant was her ex-boyfriend, and they had spent some time at a motel together a few weeks prior to July 8, 2012, but at the time of the crime, they were no longer romantically involved.

The victim had been smoking crack with Peter York, a friend, the night before the July 8, 2012 kidnapping. That morning, they were planning to do drugs, and she and the defendant had been exchanging text messages. Mr. York and the victim picked the defendant up off the street in front of his apartment complex. Both the victim and the defendant bought drugs. The victim testified that on the way to the defendant's apartment, she was in the back seat and the defendant was in the passenger's seat of the two-door vehicle. As they approached the defendant's apartment, the defendant kept asking her if she was coming in, but she did not respond because she did not want to go in or to anger him by refusing to go. When they arrived, she got out of the back of the car so that she could get into the front seat. The defendant accused her of having a relationship with Mr. York. The victim refused to go into the defendant's apartment. After her refusal, the defendant struck her in the face, grabbed her arm, and began to walk up to his apartment with her. She could taste blood after the defendant hit her. The victim testified she wanted to leave but was afraid he would hit her again if she broke away.

When they entered the apartment, the defendant showed her a ten- to eleven-inch knife, and she saw a larger knife under the couch. They went to the bedroom, she produced the crack, and they smoked it. The victim testified that the defendant forced her to remain in the apartment but did not force her to

3

smoke crack. The victim later heard a knocking at the door, and the defendant looked outside and said it was the police. He walked her into the bathroom, opened the shower curtain, and told her to get in the bathtub and be quiet. The victim overheard him tell officers that no one else was there, and she coughed loudly in the hope of being heard.

Mr. York confirmed that he and the victim had been together prior to the kidnapping, doing drugs. However, Mr. York denied being under the influence of drugs at the time of the offense. Mr. York testified that he and the victim had been in contact with the defendant by phone and that they then picked him up. They made two stops, and the "main outcome" was to "score drugs." Mr. York testified that the purpose of contacting the defendant was not to acquire drugs and that Mr. York could get his own drugs. According to Mr. York, the victim was in the passenger's seat and the defendant in the back seat. When they pulled into the defendant's parking lot to drop him off, the victim did not want to get out. Mr. York testified he did not want the victim to go with the defendant because the defendant had threatened to kill her. The victim raised the car seat to allow the defendant to get out. Mr. York testified that the defendant went out through the passenger's side door of the two-door vehicle and that there was a struggle during which the victim tried to shut the door. The defendant forced her out of the car, and he struck her in the face and "busted" her face open. The two went up to the apartment.

Mr. York called 911 at 8:20 a.m. on July 8, 2012. The recording of the call was played in court. During the call, Mr. York told the operator that a man had just "busted" a woman's face, tried to drag her into his house, and had threatened to kill her. He gave the number of the apartment unit that the defendant and victim had gone into and told the operator that the defendant had knives in his home.

Mr. York testified that he had not been in the defendant's apartment that day but had been there three to four days earlier, doing drugs. Mr. York acknowledged having a shoplifting conviction, numerous prior arrests, and mental health issues including diagnoses of bipolar disorder, post-traumatic stress disorder, and schizoaffective disorder, for which he was on medication.

Officers arrived on the scene shortly after the 911 call and spoke to Mr. York. Officer Joe Pennington testified that he saw blood on the ground where the assault had occurred and saw a trail of blood leading to a third floor apartment. Officer Pennington and Officer John Pryor both testified that they knocked on the door for several minutes and received no response. Eventually, the defendant opened the door. He was shirtless, and both officers testified he was sweating and had recent injuries to his hand. The defendant stated that no one else was in the apartment and that he had not been in an altercation, and he denied the police entry.

Because the police were concerned for the safety of the victim, Officer Pennington grabbed the defendant and detained him against an outside wall while Officer Pryor entered the home. As police were entering the apartment, the defendant admitted that someone else was inside. Officer Pryor testified that the victim was "hunkered down" in a bathtub with a cut over her eye and blood coming down her face. Both officers testified that the victim appeared to be very frightened. Officer Pennington testified that the victim gave him a false name but

4

that she told him her real name at the scene after he checked the information. Officer Pennington saw a knife with a blade over six inches long propped by the door. The knife had cardboard and tape on the handle to improve the grip, and there was another knife in the kitchen. Officer Pennington stated that police entered the apartment after his sergeant arrived and that a Computer-Aided Dispatch ("CAD") report which showed that his sergeant was not on the scene until 10:35 would not have been accurate because the report depended on an officer manually entering his arrival time.

      The victim was taken to a hospital, where her injuries, which required stitches, were photographed at 10:30 a.m. At the hospital, the victim gave Officer Pennington a statement about the kidnapping. At trial, the victim testified that she first gave a false name because she believed that there was a warrant out for her arrest at the time.

      Beth Halstead, the court clerk, testified that a warrant for a probation violation was issued against the victim on July 6, 2012, but that it was not entered into the system over the weekend and did not become active until July 9, 2012. The victim was arrested on July 13, 2012, for violating her probation.

      The victim testified she received a letter from the defendant while she was in custody, offering to pay for plastic surgery for her scar and asking her to tell police she had lied. She sought an order of protection against the defendant when she was released from jail.

      The victim acknowledged having prior convictions for joyriding and criminal impersonation. She denied that the defendant took her upstairs to help treat her wound. The victim stated that she was on drugs at the time but denied that her drug usage affected her memory. The victim testified that when she was in the bathtub, she wanted to be found and that she "would rather be in jail than beaten" but that she was not sure if she would be able to get to police if she left the bathroom. She acknowledged having given police a false name when she was pulled over some days prior to the kidnapping.

      The trial court found the defendant guilty of aggravated kidnapping. At the sentencing hearing, the defendant's mother, who is a physician, testified regarding his history of drug abuse and his history of mental illness. She stated that the defendant was bipolar and required medication. His mother believed he had a good heart, and she did not believe he committed the crime. The defendant also testified at the hearing, accusing the prosecutor and police officers of lying and falsifying documents and taking issue with the fact that the victim was not immediately arrested after the crime. He referenced certain lawsuits which he believed were the source of a bias in the judicial system. He accused the victim and Mr. York of fabricating the incident and stated the victim had stolen his EBT card. The trial court found that three enhancement factors applied. In mitigation, it found that it was "abundantly clear and obvious that [the defendant] has some serious mental health issues." The trial court sentenced the defendant to serve fourteen years in prison.

(ECF No. 24-9, at 2–5.)

### III. ISSUES PRESENTED

The petitioner's amended petition alleges seven grounds for relief:

1. The victim, witness and police who testified at trial were not credible. (ECF No. 16, at 2.)
2. Police did not have a warrant, consent or probable cause, and entered his home in violation of his Fourth Amendment right to be free from illegal search. (*Id.*)
3. The trial court erred in admitting false testimony about facts that were not corroborated by photographs or medical records. (*Id.* at 2, 4.)
4. The police failed to advise the petitioner of his *Miranda* rights. (ECF No. 16, at 4.)
5. The petitioner received ineffective assistance of trial counsel. (*Id.*)
6. The court "illegally" allowed a witness who was mentally ill and a drug user to testify. (*Id.*)
7. The prosecutor "showed fake enhancements." (*Id.*)

### IV. STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). The requirements of AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551

U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Cullen v. Pinholster*, 563 U.S. at 182. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and

adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same).[2] If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32; *see also Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine).

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him [;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their

---

[2] "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." *Walker*, 562 U.S. at 315. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id*. (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)). "A discretionary state procedural rule ... can serve as an adequate ground to bar federal habeas review ... even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id*. at 1128 (quoting *Kindler*, 558 U.S. at 60–61) (internal citations & quotation marks omitted).

default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

**V.     ANALYSIS**

The respondent asserts that all of the petitioner's claims are procedurally defaulted and barred from habeas review. (ECF No. 25, at 12–13.) The petitioner exhausted two claims on direct appeal: whether the trial court erred by failing to hold a competency hearing just before the bench trial, and whether the evidence was sufficient to support the conviction. (ECF No. 24-7, at 7.) He has not raised either of those claims in his amended habeas petition. In various pleadings in his post-conviction action, the petitioner raised versions of his current Claims 1, 2, 3, 5 and 6, about the lack of credibility of witnesses at trial (ECF No. 24-11, at 5, 7), the unconstitutional search of his home (ECF No. 24-11, at 5), the testimony about facts not corroborated by photographs (ECF No. 24-11, at 5, 7), the testimony of a witness who was "an admitted & documented schizo" and was released from drug charges after testifying (ECF No. 15, at 15; ECF No. 24-11, at 8), and ineffective assistance of trial counsel (ECF No. 24-11, at 6–7, 24–28). The court is unable to find any allegations in the post-conviction records about whether the petitioner was advised of his *Miranda* rights or about "fake enhancements" at

9

sentencing, as raised in current Claims 4 and 7.[3] But ultimately it does not matter which claims the petitioner raised at post-conviction, because he voluntarily dismissed that action before the state court had the opportunity to review the merits of his claims.

As recounted above, after appointed counsel filed an amended post-conviction petition on his behalf, the petitioner sent the state court a pro se motion to dismiss his attorney and dismiss his post-conviction action. Specifically, the petitioner wrote:

> I have no desire, or need to pursue this frivolous endeavor, as I am deeply involved in other matters, and involved with high-level persons whom [sic] need my attention on upper echelon issues, so I do not have time for court/"circus" games, furthermore, I have had to neutralize [sic] enemy combatants in prisons, so I likely will have to defend myself more times in the future, so getting out is not an easy agenda, so I won't try to get out, and will dismiss this post conviction.

(ECF No. 24-11, at 31.) In an earlier, undated pro se motion addressed to the post-conviction court, the petitioner had complained that the judge was intentionally "antagoniz[ing]" him by having him brought to court for no reason and postponing the case, and asked for an order to house him at a facility in Nashville because of the pain he experienced traveling to court in shackles on a bus from East Tennessee. (ECF No. 15, at 15–16.) He now asserts that he "had to dismiss [his] own post-conviction" because of that painful travel for "useless 'court runs,'" and because other inmates threw urine on him at the instruction of unnamed officials "to deter [him] from pursuing case." (ECF No. 32, at 2.) He argues, in essence, that those "extraordinary circumstances" should constitute cause to excuse his default. (*Id.*)

The court finds that the discomfort and unpleasantness allegedly associated with the prosecution of the petitioner's post-conviction action does not rise to the level of making such prosecution "impracticable," as required to overcome procedural default. Litigation and court appearances inevitably occasion some degree of inconvenience. The record indicates that the petitioner personally appeared in court for the hearing on his motion for voluntary dismissal, and

---

[3] The respondent asserts that the petitioner raised Claim 7 in his original post-conviction petition, but he fails to cite the specific page of the document on which he believes it was raised (ECF No. 25, at 12), and the court sees no mention of sentencing enhancements anywhere within the general citation to 6 pages of the state court petition.

that he was presented with a waiver acknowledging his understanding that "withdrawal of his Post-Conviction Relief Application will forever bar him from pursuing relief, pursuant to Tenn. Code Ann. § 40-30-106(g)," which he refused to sign. (Appendix 1; ECF No.14, at 1.) He does not claim that he was unaware of the consequences of withdrawing his post-conviction petition, or that it was not his conscious decision to do so. The petitioner's own choice to forego what he believed to be a "frivolous endeavor," either to focus on more important matters or to avoid the discomforts associated with that endeavor, cannot be construed to be a cause "external to the defense" that would warrant overlooking the default of his claims.

Because it is apparent from the record, as the trial court found at the petitioner's sentencing hearing, that the petitioner "has some serious mental health issues" (ECF No. 24-3, at 40), the court has *sua sponte* considered whether those issues might constitute cause to overcome default in this case. The United States Court of Appeals for the Sixth Circuit has held that "a borderline mental impairment is not cause for excusing procedural default," *Johnson v. Wilson*, 187 F. App'x 455, 458 (6th Cir. 2006), but it has never "squarely considered whether mental illness can constitute cause excusing procedural default." *Clark v. United States*, 764 F.3d 653, 660 n.3 (6th Cir. 2014). The District Court for the Eastern District of Michigan summarized the case law on that point:

> The majority of federal courts of appeals to have addressed the issue of whether mental illness or below-average intelligence can constitute cause have held that such limitations do not because they are not "external to the defense" as required by *Murray*. *See, e.g., Schneider v. McDaniel*, 674 F.3d 1144, 1153–55 (9th Cir. 2012) (pro se petitioner's mental condition cannot serve as cause for a procedural default, at least where the petitioner is unable to demonstrate that a mental condition rendered the petitioner completely unable to comply with a state's procedures and he had no assistance); *Harris v. McAdory*, 334 F.3d 665, 669 (7th Cir. 2003) (borderline IQ of 76 is not external to the defense and does not establish cause); *Hull v. Freeman*, 991 F.2d 86, 91 (3rd Cir.1993) (petitioner's borderline mental retardation not "cause"); *Cornman v. Armontrout*, 959 F.2d 727, 729 (8th Cir. 1992) (petitioner's below-average intelligence insufficient to establish cause). The United States Court of Appeals for the Eighth Circuit has, however, carved out an exception: "[I]n order for mental illness to constitute cause and prejudice to excuse procedural default, there must be a conclusive showing that mental illness interfered with a petitioner's ability to appreciate his

11

> or her position and make rational decisions regarding his or her case at the time during which he or she should have pursued post-conviction relief." *Holt v. Bowersox*, 191 F.3d 970, 974 (8th Cir. 1999) (citations omitted).

*Peterson v. Klee*, No. 2:12-CV-11109, 2015 WL 4389785, at *8 (E.D. Mich. July 15, 2015), *aff'd on other grounds*, 655 F. App'x 327 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 1222 (2017). Several other district courts in this circuit have also applied the Eighth Circuit's "conclusive showing" requirement. *See Parker v. Howes*, No. 5:06CV178, 2009 WL 4639496, at *3 (W.D. Mich. Dec. 2, 2009) ("While petitioner has presented some evidence of mental health treatment throughout his lifetime, he has not made a "conclusive showing" on the record that a mental condition interfered with his ability to make rational decisions with respect to pursuing post-judgment relief."); *Sudberry v. Voorhies*, No. 1:03-CV-537, 2008 WL 1905262, at *9 (S.D. Ohio Apr. 29, 2008) ("fact that petitioner may have generally 'regressed in his mental illness' and was incarcerated at a correctional treatment facility during the relevant time period" was insufficient to establish cause). Under that standard, "establishing mental illness alone is not sufficient." *Terry v. Warden*, No. 1:15 CV 2008, 2016 WL 5477552, at *12 (N.D. Ohio Mar. 3, 2016), *report and recommendation adopted sub nom. Terry v. Jackson*, No. 1:15-CV-2008, 2016 WL 5462968 (N.D. Ohio Sept. 29, 2016).

There is evidence in this case that the petitioner has a history of mental illness, and both his testimony and pleadings in state court and this court suggest some degree of incoherence and possible delusion. However, he was evaluated by a mental health profession some time before his trial and found competent, and his lucidity at a pretrial conference and with his own attorney the day before trial suggests that his behavior in state court might have been strategic. He only moved to drop his post-conviction case after his requests for a new judge and to be transferred to a facility in Nashville were unsuccessful, and he was aware of what he was doing and of the consequences it would have for his claims. Mental illness might have been a factor in his decision, but the record does not give rise to a "conclusive showing" that the petitioner did

not appreciate his position or consciously choose his path. He has not demonstrated any cause to overcome the default of his claims.

Nor has the petitioner persuaded the court that his case involves a fundamental miscarriage of justice. His mere denials that the victim and witness truthfully testified about the facts of the kidnapping are not enough to demonstrate that he is probably actually innocent of the crime. The outcome of the petitioner's trial turned on witness credibility assessments, which are "predominately the business of trial courts," and "federal habeas courts do not have license, under § 2254(d), to redetermine witness credibility, whose demeanor is observed exclusively by the state court." *Givens v. Yukins*, 238 F.3d 420 (6th Cir. 2000) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).

The petitioner procedurally defaulted his claims and cannot overcome that default. Accordingly, his petition is barred from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## VI. CONCLUSION

The petition for the writ of habeas corpus will be denied, and this case will be dismissed, for the reasons set forth above.

An appropriate order shall enter.

_____
ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE